UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AMERICAN IRON & METAL | : | |
| COMPANY, INC., | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | Case No: 3:06cv01538 (PCD) |
| | : | |
| U.S. FERROUS TRADING DIVISION, | : | |
| TUBE CITY DIVISION, TUBE CITY IMS, | : | |
|     Defendant. | : | |

**RULING ON MOTION TO DISMISS**

Plaintiff American Iron & Metal Company, Inc. ("AIM"), brings this action against U.S. Ferrous Trading Division, Tube City Division, Tube City IMS ("Tube City"), seeking compensatory, consequential, and incidental damages for breach of contract. Tube City moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss AIM's Complaint [Doc. No. 1] on the ground that the alleged contract was never properly memorialized by a writing sufficient to comply with the Connecticut statute of frauds, CONN. GEN. STATS. § 42a-2-201. For the reasons that follow, Tube City's Motion to Dismiss [Doc. No. 19] is **denied**.

**I.    BACKGROUND[1]**

AIM is a seller of scrap metal, and Tube City is a reseller of the same. (Compl. ¶ 9.) On or about June 20, 2006, Tube City contacted AIM in order to purchase approximately 30,000 metric tons of scrap metal to be shipped in August 2006 to Tube City's customer, Beshay Steel ("Beshay"), located in Egypt. (Id. ¶ 16.) In the scrap metal industry, this type of arrangement is

---

[1]  A court considering a motion to dismiss under Rule 12(b)(6) must accept the facts alleged in the complaint as true. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974). Accordingly, the statement of facts that follows is derived primarily from Plaintiff's Complaint. This Court has also considered two e-mails attached to Defendant's Motion to Dismiss, consistent with Second Circuit caselaw. See Section II, infra.

1

termed a "principal-to-principal" transaction, in which the arrangement between the seller and reseller is not dependent on other arrangements between the reseller and its customers. (Id. ¶¶ 12, 14, 19). A "principal-to-principal" transaction stands in contrast to an arrangement involving an agent, in which an agent acts as a liaison between the seller and the ultimate customer and earns a commission on the sale. (Id. ¶ 13.)

AIM responded to Tube City's June 20, 2006 inquiry with an offer to sell 20,000 metric tons of "HMS1" scrap metal for $300 per metric ton and 10,000 metric tons of "P&S" scrap metal for $303 per metric ton. (Compl. ¶ 17.) On or about June 23, 2006, Tube City increased the volume it wished to purchase to 35,000 metric tons. (Id.) That same day, AIM and Tube City agreed that AIM would sell Tube City 30,000 metric tons of "HMS1" scrap metal at $300 per metric ton and 5,000 metric tons of "P&S" scrap metal for $305 per metric ton for a total of 35,000 metric tons of scrap metal for $10,525,000. (Id. ¶¶ 17-18.) Tube City verbally accepted AIM's offer. (Id.) On June 26, 2006, Tube City confirmed its acceptance in an e-mail sent to AIM. (Id. ¶ 18.)

AIM and Tube City agreed that AIM would ship the scrap metal directly to Beshay during the month of August. (Compl. ¶ 2.) However, in the weeks following the parties' agreement, the price of scrap metal began to decrease, and Tube City informed AIM that Beshay no longer wanted the scrap metal at the agreed upon price. (Id.) Thereafter, Tube City withdrew from its agreement with AIM. (Id.) AIM attempted to mitigate its damages by instructing Tube City to sell the scrap metal at the best price it could obtain, but Tube City instead continued to attempt to resurrect its agreement with Beshay. (Id. ¶ 3.) On or about September 8, 2006, AIM sold the scrap metal for $9,800,000–$725,000 less than the contract price to which Tube City had agreed

to pay. (Id. ¶ 4.) AIM paid an additional $210,000 to store the scrap metal. (Id. ¶¶ 31-32.) Thereafter, on September 29, 2006, AIM brought this action against Tube City.

Two e-mails dated June 23, 2006, and June 26, 2006, purport to memorialize the agreement between AIM and Tube City. Both contained a "Subject" heading that read "Re: Steel Scrap for Egypt," and were sent by Detlef Mueller, Tube City's Managing Director, to Herbert Black, AIM's CEO. (June 23, 2006 e-mail, Ex. 1 to Def.'s Mot. Dismiss; June 26, 2006 e-mail, Ex. 2. to Def.'s Mot. Dismiss; see Compl. ¶ 22 (identifying Herbert Black as AIM's CEO).) The relevant portions of these e-mails are produced below:

> Thanks for your offer per phone earlier today, i.e.:
>
> about 25-30,000 MT HMS1, your option
> about 10-5,000 MT P&S, your option
> ------------------------------------------------
> about 30-35,000 MT total, your option
>
> for shipment anytime August, 2006, your option
>
> Price:   HMS-USD 300/MT
>          P&S-USD 305/MT
> . . . .
>
> The Egyptians said they'd open their L/C within 5 working days. We'd expect to pay you out of that L/C, without any out-of-pocket expenses against our small commission (which we'd have to share with our Egyptian agent), e.g., banking expenses, survey fees.
>
> Thanks for your support. Let's keep our fingers crossed for our joint efforts to be successful.

(June 23, 2006 e-mail.)

> Following our telcon earlier today, we hereby confirm that the Egyptians accepted your/our firm counter as per our [June 23, 2006] email . . . .
>
> They require, however, that 97% of the cargo value is payable against shipping documents under their L/C and the balance after completion of discharge and draft survey there by SGS at both ends (also for quality inspection at loadport and final there!) with average of both SGS draft survey's to be the final weight.

3

> This is standard in Egypt, and we hope acceptable to you too.
>
> We could try to have the balance over 97% payable under the Egyptian letter of credit against a final settlement sheet based on the average weight between both SGS draft surveys and supported by copies of same prior to expiration date of the L/C, failing which the full balance of 3% to be automatically released (i.e. I'm not suggesting that you/we have to run after the Egyptians in their country to collect the balance payment but that this is secured!)
>
> If you have any further questions, please let me know. Otherwise, please o.k. and we'll proceed issuing the corresponding contract.

(June 26, 2006 e-mail.)

## II. STANDARD OF REVIEW

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957); see also Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229 (1984); Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).

Typically, when a party submits additional evidence to the court in connection with a motion to dismiss, the court must convert the motion to dismiss into a motion for summary judgment or exclude the extraneous documents from consideration. FED. R. CIV. P. 12(b); see Fonte v. Bd. of Managers of Continental Towers Condos., 848 F.2d 24, 25 (2d Cir.1988). However, when a plaintiff does not to attach to the complaint or incorporate by reference a legal document such as a contract or a prospectus upon which it solely relies and which is integral to the complaint, the defendant may produce that document when attacking the complaint for its

4

failure to state a claim. Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 47 (2d Cir. 1991); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (citing Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995))). Given that the "terms and effect" of the e-mails provided by Defendant are central to the statute-of-frauds issue in this case, and given that Plaintiff does not dispute this fact, (see Pl.'s Mot. Opp. 2), this Court will view the content of the e-mails along with the Complaint in the light most favorable to Plaintiff in arriving at its Ruling.

### III. DISCUSSION

AIM and Tube City agree that the alleged scrap-metal transaction was a sale of goods for a value of at least $500. (Compl. ¶20; Def.'s Mem. 4). Therefore, the transaction is subject to the Connecticut U.C.C. generally and the Connecticut statute of frauds in particular. See CONN. GEN. STATS. §§ 42a-2-102, 2-201(1). A contract subject to the statute of frauds is enforceable only if "there is some writing sufficient to indicate that a contract . . . has been made . . . and signed by the party against whom enforcement is sought." Id. § 42a-2-201(1). The writing must specify the quantity of goods to be sold. Id. § 2-201 cmt. 1 (2002) ("The only term which must appear is the quantity term.").

Since both AIM and Tube City are "person[s] who deal[] in goods of the kind . . . involved in the transaction," id. § 42a-2-104(1), the "merchant exception" to the statute of frauds applies. Id. § 42a-2-201(2). The merchant exception provides:

> [I]f within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it

5

> satisfies the requirements of subsection (1) . . . unless written notice of objection . . . is given within ten days after it is received.

The merchant exception simply relaxes the signature requirement for the enforcement of a contract that otherwise satisfies the dictates of section 42a-2-201(1). Specifically, the merchant exception ensures that both the recipient and the sender of a confirmatory writing can invoke the statute of frauds against the other without a signature, thus acknowledging the "common practice among merchants . . . to enter into oral sales agreements later confirmed in writing by one of the parties." Bazak Int'l Corp. v. Mast Indus., 535 N.E.2d 633, 637 (N.Y. 1989); see Gen. Trading Int'l, Inc. v. Wal-Mart Stores, Inc., 320 F.3d 831, 836 (8th Cir. 2002) ("While the merchants' exception does not require a confirmatory writing to be signed by the party to be charged . . . the writing still must satisfy the dictates of § 2-201(1)."). Therefore, notwithstanding the applicability of the merchant exception, any writing purporting to memorialize the agreement between AIM and Tube City must satisfy section 42a-2-201(1).

In the instant case, the relevant writing consists of two e-mails dated June 23, 2006, and June 26, 2006. The June 26, 2006 e-mail incorporates the June 23, 2006 e-mail by reference, and therefore they may be considered to be part of the same writing. See RESTATEMENT (SECOND) OF CONTRACTS § 132 (1981). To satisfy the statute of frauds, these e-mails must, inter alia, (a) "specify a quantity," and (b) "evidence a contract for the sale of goods." CONN. GEN. STATS. § 42a-2-201(1) cmt. 1 (2002). In its Motion to Dismiss, Tube City argues that the e-mails fail to satisfy both requirements. With respect to the second requirement, Tube City specifically argues that the e-mails do not adequately (1) identify the parties to the contract, (2) describe the method and terms of payment, or (3) indicate a final agreement not subject to continuing negotiations. The Court will address each argument in turn.

A.  **The Quantity Term**

In order to comply with the statute of frauds, "[t]he writing must specify the quantity of goods to be sold." Omega Eng'g, Inc. v. Eastman Kodak Co., 908 F. Supp. 1084, 1090 (D. Conn. 1995); see Rosenfeld v. Basquiat, 78 F.3d 84, 93 (2d Cir. 1996) ("Under the U.C.C., the only term that *must* appear in the writing is the quantity." (emphasis in original)); CONN. GEN. STATS. § 42a-2-201 cmt. 1 (2002). Tube City argues that the June 23, 2006 e-mail fails to satisfy the quantity-term requirement because it "discusses a quantity *range*" and uses the word "about." (Def.'s Mem. 10 (emphasis in original).)

The Second Circuit, interpreting Connecticut law, has specifically rejected the argument advanced by Tube City. In Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736 (2d Cir. 1998), the court reviewed a letter purporting to memorialize a beverage-packaging agreement between the parties. The letter provided that "[t]he contract price will be $3.25 per case without water or $3.75 using your water" and that "[o]ur projections are 1/2 to 1 million cases." Id. at 741. The court held that "description of quantity in terms of a range satisfies the Statute of Frauds." Id. at 749. In so holding, the court referenced the commentary of the Connecticut U.C.C., which provides that quantity "need not be accurately stated but recovery is limited to the amount stated." Id. (quoting CONN. GEN. STAT. § 42a-2-201 cmt. 1).

In response, Tube City points out that the "ranges" provided in the June 23, 2006 e-mail "represent approximately ten percent of the $10,525,000 sale alleged by the plaintiff," (Def.'s Mem. 10), and that "this would be most significant to all the parties," (Def.'s Reply 6.) While an extreme quantity range may indicate that the parties did not intend to be bound in contract, cf. Kleinschmidt Div. of SCM Corp. v. Futuronics Corp., 41 N.Y.2d 972, 973 (1977) (finding no

7

contract where a dispute over material terms manifested a lack of contractual intent), this question of contract formation is separate from whether the quantity requirement of the statute of frauds is satisfied. See Subsection III.B, infra. Indeed, in Nora, the quantity range alone provided for a fifty-percent differential with respect to the maximum potential contract price, and yet the quantity range still satisfied the statute of frauds. Therefore, the Court finds that the writing offered in the instant case satisfies the quantity requirement of the statute of frauds.

### B. The Existence of an Agreement

While it is true that a writing satisfying the statute of frauds must "evidence a contract for the sale of goods," CONN. GEN. STATS. § 42a-2-201(1) cmt. 1 (2002), this requirement is not exacting. Indeed, "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." Id. "The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated." Id. Moreover, finding that a writing is sufficient to evidence a contract for purposes of the statute of frauds is distinct from determining whether a contract was actually formed. Determining whether a writing adequately evidences a contract for purposes of the statute of frauds is a matter of law for the court, see Bazak 535 N.E.2d at 635 (citing Scheck v. Francis, 535 N.E.2d 633, 635 (N.Y. 1970)); Kalas v. Cook 800 A.2d 553, 557 (Conn. App. Ct. 2002), while "[t]he determination of whether there was a meeting of the minds sufficient to constitute a contract is one of fact," U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 145 (2d Cir. 2001).

#### 1. The Identities of the Parties

First, Tube City argues that the writings proffered by AIM do not adequately evidence the

8

existence of a contract because they "fail[] to unambiguously identify the parties to the purported agreement." (Def.'s Reply 7.) Specifically, Tube City argues that the statement "we hereby confirm that the Egyptians accepted your/our firm counter" in the June 26, 2006 e-mail generates sufficient ambiguity as to render the proffered writings unable to evidence an agreement between AIM and Tube City. (Id. 6-7.) However, this Court finds that Tube City overstates both the requirements of the statute of frauds and the supposed ambiguity presented by the e-mails.

While it is true that "[n]o contract can be said to be fully and formally integrated unless the document . . . identifies the contracting parties," 4-22 CORBIN ON CONTRACTS § 22.3 (rev. ed. 1997), the statute of frauds does not require "full[] and formal[]" integration. Rather, as stated previously, "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." CONN. GEN. STATS. § 42a-2-201(1) cmt. 1 (2002). Moreover, the commentary to the statute specifically provides that the writing "need not indicate which party is the buyer and which is the seller." Id. Here, the e-mails proffered as a writing memorializing an agreement between AIM and Tube City are sent by Detlef Mueller, Tube City's Managing Director, to Herb Black, AIM's CEO. (June 23, 2006 e-mail; June 26, 2006 e-mail; see Compl. ¶ 22 (identifying Herbert Black as AIM's CEO).) The e-mails also contain statements such as "[t]hanks for your offer per phone earlier today," "[w]e'd expect to pay you out of that L/C," and "we hope acceptable to you." (June 26, 2006 e-mail; June 23, 2006 e-mail.) The Court cannot conclude at this time that there is *no ambiguity* as to the obligations among AIM, Tube City, and "the Egyptians," but AIM need not prove such a holistic understanding of the contract in order to survive a motion to dismiss for failure to satisfy the statute of frauds. Any ambiguity in the contractual obligations presents a question of fact as to contract formation, and upon a

proper motion may vitiate the existence of the contract altogether. See Sartor v. Town of Manchester, 312 F. Supp. 2d 238, 243 (D. Conn. 2004) (if a moving party "cannot establish unambiguous contract language, a material issue exists as to the parties' intent and the non-moving party may introduce extrinsic evidence on that issue at trial." (citing Orange Improvements P'ship v. Cardo, Inc., 984 F. Supp. 85, 89 (D. Conn.1997)). However, contract formation is not at issue in this stage of the proceedings. Rather, the Court must simply decide whether the e-mails "afford a basis for believing" in the existence of "a real transaction," CONN. GEN. STATS. § 42a-2-201(1) cmt. 1 (2002), and insofar as this requires the identification of the parties to the alleged agreement, the proffered e-mails are sufficient.

The sole case cited by Tube City in support of its argument, Smith Packing Co., Inc. v. Quality Pork International, Inc., 561 N.Y.S.2d 970 (N.Y. App. Div. 1990), is clearly distinguishable from the instant case. There, the proffered writing "fail[ed] to make *any reference* to an agreement with the defendant," a Nebraska corporation, and instead "indicate[d] a contract . . . between [the] plaintiff and the State of New York." Id. at 971 (emphasis added). Although the writing in Smith Packing contained the notation "CONFIRMED WITH Laura Lee," it failed to identify who Laura Lee was, "let alone establish that she was defendant's agent." Id. Such infirmities clearly are not present in the e-mails proffered here. Both the sender and recipient of the e-mails are readily identifiable as agents of the defendant and plaintiff in this case, and the content of the e-mails "afford a basis for believing" in a "real transaction" between them. Therefore, this Court finds that the e-mails adequately identify the parties to the alleged contract for purposes of the statute of frauds.

        2.       The Method and Terms of Payment

Tube City next argues that the e-mails fail to evidence an agreement because "critical issues, such as the form and the terms of payment had not yet been determined or agreed upon." (Def.'s Mem. 12.) However, the determination of method and terms of payment are not "critical issues" with respect to the statute of frauds. Rather, "[t]he price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." CONN. GEN. STATS. § 42a-2-201(1) cmt. 1 (2002). In fact, the commentary to the statute provides that "[s]pecial emphasis must be placed on the permissibility of omitting the price term in view of the insistence of some courts on the express inclusion of this term." Id. However, it is also true that a failure to finalize a price term may ultimately evince a lack of intent to be bound. See AFP Imaging Corp. v. Philips Medizin Systeme Unternehmensbereich der Philips, GmbH, No. 92 CIV. 6211 (LMM), 1994 WL 652510 (S.D.N.Y. Nov. 17, 1994), at *8-9 (finding, on a motion for summary judgment, that writings failed to satisfy the statute of frauds because "a *dispute* over several essential terms, including . . . payment terms, . . . *demonstrated a lack of intent to be bound*" (emphasis added)). Still, on a motion to dismiss, this Court is unable to conclude that continuing negotiations as to payment necessarily vitiate the parties' intent to be bound by a contract. See CONN. GEN. STATS. § 42a-2-204 cmt. 1 (2002) ("The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions."). Therefore, this Court concludes that continuing negotiations as to the methods and terms of payment do not render the e-mails inadequate under the statute of frauds.

   3.  Ongoing Negotiations and a Future Contract

Finally, Tube City argues that the e-mails indicate "ongoing negotiations" and a "future

contract" and therefore should be construed as mere "preliminary negotiations" that fail to satisfy the statute of frauds. (Def.'s Mem. 13-14.) Insofar as these "ongoing negotiations" refer to methods and terms of payment between Tube City and AIM, this Court has already addressed and rejected the argument. Tube City also argues that language in the June 26 email stating, "please o.k. and we'll proceed issuing the corresponding contract," shows that Tube City and AIM's communications were merely preliminary negotiations which had not yet led to the formation of a contract. However, when viewed in the light most favorable to AIM, this language may be reasonably construed to refer solely to the letter of credit and other payment provisions regarding Tube City's arrangement with Beshay. Such language could thereby serve as evidence of Tube City's intent to enter a separate contract with Beshay Steel and not as an indication that a further writing was required to form an agreement between Tube City and AIM. Tube City may have believed that AIM would be interested in this information irrespective of whether it implicated their agreement, particularly in light of Tube City's e-mail that provided, "[w]e'd expect to pay you out of that L/C." (June 23, 2006 e-mail.) Therefore, this Court cannot determine as a matter of law that this language precludes the existence of a contract between AIM and Tube City.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. No. 20] is hereby **denied**.

SO ORDERED.

Dated at New Haven, Connecticut, April  13 , 2007.

                                                               /s/
                                        _____

Peter C. Dorsey, U.S. District Judge  
United States District Court